PUBLISHED

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

WILMINGTON SHIPPING COMPANY;
PETER BROWN RUFFIN, JR.,
*Plaintiffs-Appellants,*

and

PETER BROWN RUFFIN,
*Plaintiff,*

v.

NEW ENGLAND LIFE INSURANCE
COMPANY,
*Defendant-Appellee.*

No. 06-2052

Appeal from the United States District Court
for the Eastern District of North Carolina, at Wilmington.
Malcolm J. Howard, Senior District Judge.
(7:03-cv-00035-H)

Argued: May 21, 2007

Decided: August 3, 2007

Before WILLIAMS, Chief Judge, and MOTZ and
SHEDD, Circuit Judges.

---

Affirmed in part and reversed in part by published opinion. Chief
Judge Williams wrote the opinion, in which Judge Motz and Judge
Shedd joined.

---

## COUNSEL

**ARGUED:** David Calep Wright, III, ROBINSON, BRADSHAW &
HINSON, P.A., Charlotte, North Carolina, for Appellants. Eric D.

Welsh, PARKER, POE, ADAMS & BERNSTEIN, L.L.P., Charlotte, North Carolina, for Appellee. **ON BRIEF:** B. Chad Ewing, ROBIN-SON, BRADSHAW & HINSON, P.A., Charlotte, North Carolina, for Appellants. Stacy K. Wood, Kristin R. Poolos, PARKER, POE, ADAMS & BERNSTEIN, L.L.P., Charlotte, North Carolina, for Appellee.

---

# OPINION

WILLIAMS, Chief Judge:

Appellants Wilmington Shipping Company ("WSC") and Peter Brown Ruffin, Jr. appeal from the district court's grant of summary judgment to New England Life Insurance Company ("NEL") on Ruffin's claim for breach of fiduciary duty under § 502(a)(2) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C.A. § 1132(a)(2) (West 1999 & Supp. 2005), and Appellants' claims under North Carolina law for unfair and deceptive trade practices, breach of contract, negligent misrepresentation, and constructive fraud. Appellants allege, among other things, that NEL grossly mismanaged the assets of WSC's pension plan (the "Plan"), ultimately resulting in the Plan's insolvency and termination, and that NEL consistently misinformed them about the Plan's financial health in an effort to conceal this mismanagement. The district court ruled that Ruffin, a Plan participant, does not have standing to sue under ERISA § 502(a)(2) because the Plan is now terminated and the Pension Benefit Guaranty Corporation ("PBGC") has been appointed statutory trustee over the Plan. The district court also ruled that ERISA preempts Appellants' various state-law claims because the claims relate to the Plan.

We agree with the district court that ERISA preempts Appellants' state-law claims because they "relate to" the Plan. We conclude, however, that Ruffin has standing to sue under ERISA § 502(a)(2) even though the Plan is now terminated and the PBGC has been appointed trustee over the Plan. Accordingly, we affirm the district court's grant of summary judgment to NEL on Appellants' state-law claims and reverse the district court's grant of summary judgment to NEL on Ruffin's ERISA claim.

## I.

### A.

This is a summary judgment case, so we construe the facts in the light most favorable to Appellants, the non-moving parties, drawing all reasonable inferences in their favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

WSC is a North Carolina corporation that offers a number of services to the steamship industry, including vessel maintenance, repair, and warehousing. Peter Brown Ruffin, Jr. is a shareholder and officer in WSC and a participant in the Plan. Ruffin's father, Peter Brown Ruffin, Sr., was one of WSC's founders. NEL is a Massachusetts insurance company.[1]

On January 1, 1970, WSC created the Plan as a defined-benefit pension plan for its employees.[2] WSC employed NEL to help create the Plan. NEL advised WSC concerning all aspects of the Plan and drafted the Plan documents. The Plan named WSC as the Plan Administrator, and WSC administered the Plan from its inception to its termination. As Plan Administrator, WSC did "not have any authority over the investment of the assets of the Plan." (J.A. at 625.)[3] Instead, the Plan provided that WSC would enter into group annuity policies with an insurance company and that the insurance company would manage the Plan's investments.

---

[1]New England Mutual, a subsidiary of NEL, sold WSC the two group annuity policies at issue in this case. For ease of reference, the opinion uses "NEL" to refer both to NEL and New England Mutual, although we note that NEL has asserted an affirmative defense that it is not a proper party to this action.

[2]Under a defined-benefit plan, "the benefits to be received by employees are fixed and the employer's contribution is adjusted to whatever level is necessary to provide those benefits." *Ala. Power Co. v. Davis*, 431 U.S. 581, 593 n.18 (1977).

[3]Citations to "(J.A. at ___.)" refer to the contents of the Joint Appendix filed by the parties in this appeal.

WSC selected NEL as the insurance company that would perform these functions.[4] In 1970, NEL issued a group investment account policy (the "GIA Policy") to WSC. The GIA Policy consisted of a general investment account and other specialized investment accounts for equity securities, capital growth, bonds, mortgages, and real estate. Under the terms of the policy, the Plan Administrator had "no individual ownership of any investments or other assets of the [investment] Accounts" and NEL had "exclusive ownership and control" of funds deposited by the Plan. (J.A. at 1225.)

In 1982, NEL issued another policy to WSC, the Developmental Properties Account ("DPA") Policy. Pursuant to the policy, WSC deposited Plan funds into the DPA to be used by one of NEL's wholly-owned subsidiaries for investment in real estate. (J.A. at 1533.) NEL's offering brochure for the DPA Policy described NEL as a "statutory fiduciary under ERISA." (J.A. at 1260.) As with the GIA Policy, the DPA Policy gave NEL exclusive control and ownership of the funds invested by the Plan.

For nearly a decade, the relationship between the parties was uneventful, but, in 1991, it changed. In that year, Ruffin and Robert Hutchens purchased WSC. At the time, the Plan appeared on paper to be in excellent financial shape, having roughly $5 million in assets — with the DPA valued at around $1.5 million — and liabilities of only $3.3 million. In fact, the Plan's financial health seemed so assured that, upon purchasing WSC, Ruffin and Hutchens specified that the Plan's surplus would go to its participants in the event the Plan was terminated.

Following the change in ownership, WSC informed NEL during a July 1991 meeting that it wanted to terminate the Plan and instead fund a 401(k) plan. During the meeting, however, NEL told WSC that the Plan could not be terminated at the time because the DPA was "not currently liquid" due to "all cash [ ] going into properties." (J.A. at 924-25.) WSC officials were upset by this news. They expressed their displeasure with NEL's investment management and questioned

---

[4]In 1969, NEL solicited the Plan's business by touting its more than thirty years of experience in pension plan asset and investment management.

NEL's investment decisions with respect to both the GIA and DPA Policies.

WSC continued to express its strong desire to terminate the Plan. In response, NEL advised WSC to freeze future benefit accruals and wait until the DPA was "liquid" to terminate the Plan. (J.A. at 1315.) NEL estimated that it would take roughly two years to terminate the Plan, and NEL's actuary did not believe that WSC would have to make any more contributions to the Plan, even under a "worst case scenario." (J.A. at 1318.)

So WSC waited. All the while the DPA's value spiraled downward. The GIA Policy did not fare much better, producing lower-than-market returns in both 1994 and 1995. The large number of participants entitled to Plan benefits only compounded the Plan's financial problems. Nevertheless, from 1991 to 1996, WSC "s[a]t tight," as NEL advised, waiting for the DPA to become liquid so that the Plan could be terminated. (J.A. at 1331.)

In 1996, NEL informed WSC that it needed to contribute more than $130,000 to the Plan to completely fund it. At a meeting, Hutchens and Bill Emerson, WSC's CEO, again complained to NEL about WSC's inability to terminate the Plan and diversify its assets. NEL responded that WSC could move the Plan's funds into other investments, but only if the Plan paid a penalty to NEL amounting to more than $200,000. NEL alternatively offered to allow WSC to transfer twenty percent of the GIA Policy's assets each year for five years, but then only to other NEL-controlled accounts.[5]

WSC took NEL up on its offer to transfer twenty percent of the GIA Policy's funds per year. At the time, NEL reaffirmed its commit-

---

[5]Appellants contend that NEL knew all along that the Plan was doomed and concealed this fact from WSC. In an internal email in April 1996, one NEL employee observed that the GIA policy account was "on the sick side," that it would "get worse over the next several years," and that "getting out now is in [WSC's] best interest." (J.A. at 1313.) In another email, the employee expressed her concern that, given the Plan's impending doom, NEL was "really in for it on this one." (J.A. at 1314.)

ment to monitoring the Plan's assets. But the DPA never recovered. It was ultimately liquidated and paid out from 1996 to 2003.

In March 2000, NEL submitted a final termination study to WSC. Although the study concluded that "much ground ha[d] been made up" in terms of the Plan's performance, the Plan was still underfunded by between $150,000 and $200,000, an amount that NEL concluded WSC would need to contribute if it chose to terminate the Plan immediately. (J.A. at 1387-88.)

B.

On March 7, 2003, Appellants, along with Ruffin, Sr., brought suit against NEL under ERISA § 502(a)(2), alleging that NEL had breached its fiduciary duties to the Plan and caused the Plan severe financial loss. NEL answered on May 19, 2003, denying the wrongdoing and asserting a number of affirmative defenses, including that it was not a fiduciary under ERISA.

NEL's denial of fiduciary status under ERISA led Appellants to move to amend their complaint to add state-law claims against NEL for unfair and deceptive trade practices, breach of contract, negligent misrepresentation, and constructive fraud. NEL opposed Appellants' motion, arguing that ERISA preempted the proposed state-law claims. On November 21, 2003, the district court granted Appellants leave to amend their complaint to add the state-law claims.

On July 22, 2004, NEL moved for summary judgment on the grounds that (1) Appellants' claims were barred by the statute of limitations and laches; (2) NEL was not a fiduciary under ERISA as a matter of law; (3) ERISA preempted Appellants' state-law claims; and (4) there was no factual basis for Appellants' state-law claims. Appellants opposed the motion.[6]

In December 2004, the PBGC, a wholly-owned federal corporation charged with administering ERISA and its pension insurance pro-

[6]Peter Brown Ruffin, Sr. died before Appellants responded to NEL's motion for summary judgment.

gram, determined that the Plan lacked sufficient assets to continue paying benefits to participants. The PBGC concluded that termination of the Plan would serve the best interests of the Plan's participants.

Accordingly, on January 28, 2005, the PBGC and WSC executed an agreement terminating the Plan, effective December 31, 2004, and appointing the PBGC as statutory trustee of the Plan pursuant to 29 U.S.C.A. § 1342(b) (West 1999 & Supp. 2007). On March 22, 2005, the PBGC notified the district court of its appointment as trustee of the now-terminated Plan.

In February 2006, the PBGC moved to dismiss WSC's ERISA claim because WSC was no longer a fiduciary of the Plan. In the motion, the PBGC also informed the court that it had "decided that it [was] not in the best interest of the terminated Pension Plan [for the PBGC] to join in this action." (J.A. at 1911.) WSC did not oppose the motion because it had "effectively ceased its administrative responsibilities with respect to the Plan." (J.A. at 1922.) WSC did, however, note its belief that the dismissal of its ERISA claim did "not affect Peter Ruffin's standing to assert a claim for breach of fiduciary duty." (J.A. at 1922.) The PBGC took no position on the question of Ruffin's standing under ERISA.

On March 30, 2006, the district court dismissed WSC's ERISA claims and denied as moot NEL's pending summary judgment motion, but the court granted NEL leave to file another summary judgment motion on Ruffin's ERISA claim and Appellants' remaining state-law claims.

NEL filed another motion for summary judgment, and on August 28, 2006, the district court granted summary judgment to NEL on Appellants' remaining claims. The court ruled that Ruffin lacked standing as a Plan participant to assert a claim under ERISA once the PBGC terminated the Plan and assumed the role of statutory trustee. The court reasoned as follows:

> When a pension plan covered by Title IV terminates, PBGC determines whether the Plan has sufficient funds to pay the pension benefits earned by participants. 29 U.S.C. § 1341(c), 1342(a). If the plan is underfunded, PBGC typi-

cally becomes statutory trustee and assumes the obligations to pay the benefits earned by plan participants to the extent that they are guaranteed under Title IV. 29 U.S.C. §§ 1342, 1361. In such cases, Title IV's insurance program is the exclusive means through which plan participants, such as co-plaintiff, Peter Ruffin, Jr., may recover benefits under the plan.

J.A. at 2182 (internal quotation marks omitted).) With respect to Appellants's state-law claims, the court ruled that ERISA preempted those claims because "they are based on facts, circumstances, and allegations that relate directly to the Plan, its assets, and its administration." (J.A. at 2183.)

Appellants timely appealed. We have jurisdiction pursuant to 28 U.S.C.A. § 1291 (West 2006).

## II.

We review de novo the district court's grant of summary judgment to NEL. *Laber v. Harvey*, 438 F.3d 404, 415 (4th Cir. 2006)(en banc). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). As noted above, we construe the facts in the light most favorable to Appellants and draw all reasonable inferences in their favor. *Anderson*, 477 U.S. at 255. In this appeal, Ruffin challenges the district court's ruling that he does not have standing under ERISA § 502(a)(2) to sue for breach of fiduciary duty now that the Plan is terminated and the PBGC is statutory trustee, and Appellants together challenge the district court's ruling that ERISA preempts their various state-law claims. We address these arguments in turn.

## A.

Because PBGC's involvement in this case is central to the arguments on appeal, a description of its functions under ERISA is in

order. When PBGC is appointed as statutory trustee over a terminated plan, it wears two hats: one as guarantor of ERISA's insurance program under Title IV and one as trustee. These roles are different.

## 1. The PBGC as Guarantor.

The PBGC is a wholly-owned corporation of the United States Government that is modeled after the Federal Deposit Insurance Corporation. *Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 636-37 (1990). The PBGC's Board of Directors consists of the Secretaries of the Treasury, Labor, and Commerce. 29 U.S.C.A. § 1302(d) (West 1999 & Supp. 2007). The corporation administers Title IV of ERISA, which includes a mandatory government insurance program that protects the pension benefits of private-sector American workers who participate in ERISA-covered pension plans. *LTV Corp.*, 496 U.S. at 637; 29 U.S.C.A. §§ 1321-1322a (West 1999 & Supp. 2007). "The cost of the PBGC insurance is borne primarily by employers that maintain ongoing pension plans." *LTV Corp.*, 496 U.S. at 638. ERISA requires covered employers to pay annual premiums into the program. *See* 29 U.S.C.A. §§ 1306, 1307 (West 1999 & Supp. 2007). The program "is also financed by statutory liability imposed on employers who terminate under-funded pension plans." *LTV Corp.*, 496 U.S. at 638. "In enacting Title IV, Congress sought to ensure that employees and their beneficiaries would not be completely deprived of anticipated retirement benefits by the termination of pension plans before sufficient funds have been accumulated in the plan." *Id.* at 637 (internal quotation marks omitted).

ERISA authorizes the PBGC to institute termination proceedings against an ERISA-covered plan whenever, *inter alia*, the plan has insufficient assets to satisfy its pension benefit obligations or the possible long-run loss of the PBGC with respect to the plan will increase unreasonably if the plan is not terminated. 29 U.S.C.A. § 1342(a). Once a plan is terminated, the PBGC is authorized to appoint a statutory trustee to administer the plan. 29 U.S.C.A. § 1342(b)(1)-(3). The trustee must use the plan's assets to cover what it can of the plan's benefit obligations. 29 U.S.C.A. § 1344 (West 1999 & Supp. 2007). If there is a shortfall, then "[t]he PBGC then must add its own funds to ensure payment of most of the remaining 'nonforfeitable' benefits, i.e., those benefits to which participants have earned entitlement

under the plan terms as of the date of termination." *LTV Corp.*, 496 U.S. at 637-38. "ERISA does place limits on the benefits the PBGC may guarantee upon plan termination, however, even if the participant was entitled to greater benefits under the terms of the plan." *Id.* at 638.

### 2.   The PBGC as Statutory Trustee.

As noted above, ERISA grants the PBGC authority to appoint a statutory trustee over a terminated plan. The PBGC may either apply to the appropriate district court for the appointment of the trustee or may (as happened here) consult with the plan administrator and agree upon a trustee. 29 U.S.C.A. § 1342(b)(3). Although the PBGC "may request that it be appointed as trustee of a plan in any case," *id.* § 1342(b)(1), and in fact does so in the lion's share of cases, *see LTV Corp.*, 496 U.S. at 637, the statute does not mandate that the PBGC be appointed as trustee. *See also Boivin v. U.S. Airways, Inc.*, 446 F.3d 148, 150 (D.C. Cir. 2006) (noting that, although "ERISA . . . does not require . . . the PBGC to be appointed as the successor trustee," "[i]n practice, the PBGC has always applied to serve as successor trustee for distress-terminated defined-benefit plans"); *Pension Benefit Guar. Corp. v. Beverley*, 404 F.3d 243, 249 (4th Cir. 2005) ("Although PBGC may request and often does request that it be appointed as statutory plan trustee . . ., a third party may also be appointed as statutory plan trustee.").

ERISA grants the statutory trustee all the powers held by the plan administrator. 29 U.S.C.A. § 1342(d)(1)(A)(I). In addition, the trustee has the power "to commence, prosecute, or defend on behalf of the plan any suit or proceeding involving the plan," 29 U.S.C.A. § 1342(d)(1)(B)(iv); "collect . . . amounts due the plan," *id.* § 1342(d)(1)(B)(ii); "pay benefits under the plan," *id.* § 1342(d)(1)(B)(I); "liquidate the plan assets," *id.* § 1342(d)(1)(B)(vi); and "limit payments of benefits under the plan to basic benefits or [ ] continue payment of some or all of the benefits which were being paid prior to his appointment," *id.* § 1342(d)(1)(A)(iv). Thus, for example, if the plan becomes fully funded at any point after plan termination, the statutory trustee may order that the plan continue to pay full benefits. If, after asset allocation, the plan is underfunded, the trustee may limit payments under

the plan to basic benefits. In that case, and after the trustee has calculated the benefits due each participant, the PBGC calculates the amount of nonforfeitable benefits guaranteed by the PBGC and pays these guaranteed amounts to the trustee, who in turn pays them to each participant. 29 U.S.C.A. § 1322.

The distinction between the PBGC's guarantor/trustee roles is particularly important with respect to the management of plan assets. As trustee, the PBGC must hold all plan assets, including assets recovered through litigation, in trust for the plan. *See* 29 U.S.C.A. § 1342(d)(1)(A)(ii). Although, as trustee, the PBGC may pool assets of terminated plans for the payment of benefits under any plan, *see* 29 U.S.C.A. § 1342(a), and is thus exempted from the fiduciary duty imposed on common-law trustees not to pool assets, the PBGC must still hold the pooled assets in trust for the terminated plans.[7] Thus, in its capacity as guarantor, the PBGC has no power over the assets of terminated plans. If a private trustee is appointed to administer a terminated plan, the private trustee, not the PBGC, holds and controls the plan's assets. *See* 29 U.S.C.A. § 1342(d)(1)(A)(iii) and (d)(1)(B)(vi).

As noted above, if a plan becomes funded after termination, the statutory trustee (be it the PBGC or a private party) retains discretion to continue to pay full benefits under the plan. *See* 29 U.S.C.A. § 1342(d)(1)(A)(iv). But this is not the only way in which a plan can continue to pay full benefits. Just as the PBGC may terminate an insolvent plan, *see* 29 U.S.C.A. § 1342(a), it may undo the termination if it determines that the plan participants will be best served by plan restoration, *see* 29 U.S.C.A. § 1347 (West 1999). In such circumstances, the PBGC may order the statutory trustee to return all or part of the plan's assets to the plan administrator so that the plan may resume normal functioning. *Id.*

Thus, ERISA does not give the PBGC in its capacity as guarantor any powers of plan administration. Rather, these powers are given to

---

[7]ERISA does permit the PBGC to retain assets of plans administered under 29 U.S.C.A. § 1342 (West 1999 & Supp. 2007), but only to the extent that plan assets exceed plan liabilities after the termination is completed. *See* 29 U.S.C.A. § 1305(b)(1)(C) (West 1999).

the "trustee," which may or may not be the PBGC. As guarantor, then, the PBGC's function with respect to a terminated plan is limited to calculating the amount necessary to guarantee each participant's non-forfeitable benefits and paying that amount to the trustee.

## B.

We review questions of standing de novo. *White Tail Park, Inc. v. Stroube*, 413 F.3d 451, 459 (4th Cir. 2005). Because "federal courts . . . have only the power that is authorized by Article III of the Constitution and the statutes enacted by Congress pursuant thereto," a plaintiff must posses both Article III and statutory standing, or the federal court to which the plaintiff has come has no power to decide his case. *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541 (1986). To this end, "[e]very federal appellate court has a special obligation to satisfy itself not only of its own jurisdiction, but also that of the lower courts in a cause under review, even though the parties are prepared to concede it." *Id.* (internal quotation marks omitted). And as the party invoking federal jurisdiction, Ruffin bears the burden of establishing his standing. *DaimlerChrysler Corp. v. Cuno*, 126 S. Ct. 1854, 1861 (2006); *Lujan v. Defenders of Wildlife*, 504 U.S. 535, 561 (1992).

As the Supreme Court has explained, "[n]o principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." *Raines v. Byrd*, 521 U.S. 811, 818 (1997)(internal quotation marks omitted). "Article III standing . . . enforces the Constitution's case-or-controversy requirement." *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 11 (2004). And even if a plaintiff possesses Article III standing, he may still be prevented from prosecuting his suit in federal court if he lacks statutory standing. *Bennett v. Spear*, 520 U.S. 154, 162-63 (1997).

## C.

We begin with the question of Ruffin's standing under Article III. The requisite elements of Article III standing are familiar: "A plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested

relief." *Allen v. Wright*, 468 U.S. 737, 751 (1984); *see also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

### 1.   Injury in Fact.

Although NEL suggests that the injury Ruffin relies on is too speculative, we conclude that he has sufficiently alleged an injury in fact. Under the terms of the Plan, Ruffin, as a Plan participant, is entitled to receive a lump-sum payment of benefits in lieu of other benefits payable to him over time. This right to a lump-sum payment was lost once the Plan was terminated. ERISA specifically protects a participant's right to receive a lump-sum payment of benefits. *See* 29 U.S.C.A. § 1054(g)(2)(B) (West 1999 & Supp. 2005) (forbidding plan amendments that decrease "an optional form of benefit"); 26 C.F.R. § 1.411(d)-4 (2007)(defining the ability to receive pensions benefits in a lump sum as an "optional form of benefit"); *Williams v. Cordis Corp.*, 30 F.3d 1429, 1431 (11th Cir. 1994) ("The payment of benefits in a lump sum is one example of a 29 U.S.C. § 1054(g)(2)(B) 'optional form of benefits.'"). Ruffin's alleged injury thus satisfies Article III's injury-in-fact requirement for it is "concrete and particularized . . . and actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (internal quotation marks and alterations omitted). As things now stand, Ruffin cannot receive a lump-sum payment of his benefits.

That Ruffin is suing on behalf of the Plan does not alter this conclusion, for a plan participant may *not* sue under ERISA § 502(a)(2) *unless* he seeks recovery on behalf of the plan. *See Mass. Mutual Life Ins. Co. v. Russell*, 473 U.S. 134, 140 (1985) (holding that a participant's action filed pursuant to ERISA § 502(a)(2) must seek remedies that provide a "benefit [to] the plan as a whole"); *Horan v. Kaiser Steel Ret. Plan*, 947 F.2d 1412, 1417 (9th Cir. 1991)("An individual beneficiary may bring a fiduciary breach claim [under ERISA § 502(a)(2)], but must do so for the benefit of the plan.").[8] Ruffin's

---

[8]Although Ruffin's primary argument is that Article III's injury-in-fact requirement is satisfied because he has suffered a direct injury — the loss of his right to a lump-sum payment — he also suggests that he satisfies Article III's injury requirement, irrespective of any personal injury he

injury is no less concrete because the benefit to him from a favorable outcome in this litigation would derive from the restored financial health of the Plan.

### 2.   Causation.

Ruffin has sufficiently alleged that NEL caused the injury he complains of in this case. Ruffin blames NEL for the Plan's untimely demise, and he claims that, as a result, he has been deprived of his right to receive a lump-sum payment of his benefits. This easily satisfies Article III's requirement that there be "a causal connection between the injury and the conduct complained of" by the plaintiff. *Lujan*, 504 U.S. at 560; *Elk Grove*, 542 U.S. at 12 ("The plaintiff must show that the conduct of which he complains has caused him to suffer an 'injury in fact'. . . .").

### 3.   Redressability.

All that is left is Article III's requirement that "it [ ] be likely, as opposed to merely speculative, that [Ruffin's] injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 560 (internal quotation marks omitted). Here the parties completely diverge.

Ruffin's argument is simple enough. Pursuant to his ERISA claim, Ruffin seeks to recover on behalf of the Plan "all losses to the Plan resulting from [NEL's] breach of fiduciary duties" and to compel NEL "to restore to the Plan all profits (including fees) of [NEL] which have been made through use of assets of the Plan by [NEL]."

---

has suffered, because Congress has expressly granted plan participants the right to bring derivative actions on behalf of ERISA plans for breach of fiduciary duties. In other words, Ruffin suggests that this is an instance where "the actual or threatened injury required by Art. III exist[s] solely by virtue of statutes creating legal rights, the invasion of which creates standing." *Warth v. Seldin*, 422 U.S. 490, 500 (1992) (internal quotation marks omitted). We leave this argument for another day, for here, in addition to the clear injury the Plan suffered, there is no doubt that Ruffin has alleged a concrete personal injury, namely, the loss of his right to a lump-sum benefit.

(J.A. at 77.) If Ruffin prevails in his suit against NEL, he contends that his injury — the loss of his right to receive a lump-sum payment of his benefits — will be redressed because funds will be awarded to the Plan sufficient to pay all of its liabilities. In that case, the PBGC, acting as statutory trustee, could continue to pay full benefits under the Plan and could take any action authorized under the Plan, including paying Ruffin his benefits in a lump sum. Alternatively, the PBGC, acting pursuant to its administrative powers under ERISA, could restore the fully-funded Plan pursuant to 29 U.S.C.A. § 1347, in which case Ruffin also would be able to receive his lump-sum payment. Either way, Ruffin argues, he will get his lump-sum payment.

NEL responds that Ruffin does not stand to benefit, either directly or derivatively, from even a full recovery in this case because the recovered funds "would . . . be merged into the coffers of the PBGC, while Ruffin and the other Plan participants will receive their guaranteed benefits — no more, no less — *no matter what the outcome of this suit*." (Appellee's Br. at 43 (emphasis in original). This is because, according to NEL, the value of Ruffin's benefits under the Plan does not exceed the value of the guaranteed benefits available to him.[9] Moreover, NEL argues that Ruffin cannot receive his benefits in a lump sum because the PBGC is generally barred by regulation from paying guaranteed benefits in lump-sum form. *See* 29 C.F.R. § 4022.7 (2006) ("If a benefit that is guaranteed under this part is payable in a single installment . . . under the terms of the plan, or an option elected under the plan by the participant, the benefit will not be guaranteed or paid as such."). So, in a nutshell, NEL argues that Ruffin will get the full value of his benefits even if he cannot get them in the form that he wants. This argument derives in part from NEL's belief that the PBGC in its capacity as statutory trustee is authorized to retain recovered Plan assets that exceed the amount necessary to pay guaranteed benefits to plan participants under 29 U.S.C.A. § 1322 and direct those assets to ERISA's insurance coffers.

The errors in NEL's argument are manifold. NEL mistakenly believes that the overarching governmental interest in the solvency of ERISA's insurance program exempts the PBGC from the otherwise

---

[9]NEL cites the affidavit of an actuarial associate as support for this conclusion.

absolute duty that ERISA imposes on fiduciaries, including statutory trustees, to hold plan assets in trust for the benefit of plan participants. As trustee, the PBGC *is not* authorized to retain Plan assets to the extent that they exceed the value of plan participants' guaranteed benefits. Rather, the PBGC, acting as trustee, must hold plan assets in trust for the benefit of plan participants and pay *all* plan benefits, if possible, in accordance with the statutory order of priorities. *See* 29 U.S.C.A. §§ 1342(d)(1)(A)(ii), 1344. Only *after* the PBGC as trustee has allocated plan assets and determined that the plan has insufficient funds to meet its obligations does the PBGC *as guarantor* "chip in" from *ERISA's funds* to cover the any unpaid guaranteed benefits. To be sure, ERISA provides that its insurance funds may be credited with the value of a terminated plan's assets administered under § 1342, but *only* to the extent that plan assets exceed plan liabilities (not to the extent they exceed guaranteed benefits), and *only* after the statutory trustee has satisfied all plan liabilities. *See* 29 U.S.C.A. § 1305(b)(1)(C) (West 1999).

NEL essentially argues that Ruffin's injury is not redressable because ERISA's insurance guarantees that he will receive the full value of his benefits, albeit in a less-preferred form, but there would be no need to resort to ERISA's coffers if Ruffin were to win a full recovery. In such case, there would be no need for the PBGC in its capacity as guarantor to pay guaranteed benefits to Plan participants from ERISA's insurance funds, for it could, in its capacity as trustee, satisfy all Plan benefit obligations out of the recovered assets of the Plan and in the ways authorized by the Plan. *See* 29 U.S.C.A. §§ 1342(d)(1)(A)(I), 1344. This would include the power to pay Ruffin his benefits in a lump sum.[10]

NEL objects that the PBGC would still be barred by regulation

---

[10]We also question NEL's premise that, because Ruffin stands to receive the full dollar amount of his benefits under the Plan through guaranteed payments, he will receive the full value of his benefits despite not being able to receive a lump sum. For a participant with a pressing financial need, whether the result of personal or medical emergency, a lump-sum payment of benefits may, in relative terms, be worth much more simply because it is paid in a lump sum as opposed to a series of smaller payments.

from paying Ruffin's benefits in a lump sum, even assuming a full recovery, but, again, this argument conflates the PBGC's role as ERISA guarantor with its role as statutory trustee. The regulation at issue, 29 C.F.R. § 4022.7, generally precludes the PBGC in its capacity as *guarantor* from paying guaranteed benefits from Title IV's insurance coffers in lump-sum form. It says nothing of the PBGC's powers as statutory trustee. ERISA, however, does. The statute grants the trustee all the powers of the plan administrator to do any act authorized by the Plan or ERISA, *see* 29 U.S.C.A. § 1342(d)(1)(A)(I), and the Plan authorizes payment of benefits in a lump sum. *See Cooke v. Lynne Sand & Stone Co.*, 70 F.3d 201, 202-03 (1st Cir. 1995) (determining the proper discount rate for trustees of a terminated plan to apply in calculating the amount of a lump-sum payment to a participant, but never questioning the trustees' authority to make such a lump-sum payment). The regulatory restraint on the PBGC's ability to pay ERISA-guaranteed benefits in lump-sum form has absolutely no bearing on its ability as statutory trustee to do what ERISA and the Plan unequivocally grant it the power to do.

Under NEL's view, it would be particularly disadvantageous to plan participants for the PBGC to be appointed statutory trustee over a terminated plan given the PBGC's license to skirt the duties imposed on statutory trustees to hold plan assets in trust for the benefit of the plan participants. According to NEL, the PBGC in its capacity as trustee may retain "excess" plan assets to satisfy its insurance obligations under ERISA when a private trustee would be required to hold plan assets in trust for plan participants, and a plan participant who would otherwise be entitled to a lump-sum payment of his benefits upon appointment of a private trustee would be precluded from receiving such a lump-sum payment when the PBGC is appointed trustee. On the other hand, NEL argues that the PBGC is not able to perform acts or functions expressly authorized by ERISA and the Plan for the statutory trustee to perform, including paying benefits in a lump sum. This is an odd, even inexplicable, result, and one that we are quite sure Congress did not intend given that Congress chose to permit others besides the PBGC to serve as statutory trustee over a terminated plan. The duties imposed on the statutory trustee do not fall by the wayside just because the PBGC, and not a private party, becomes the trustee.

In short, all of NEL's arguments challenging Ruffin's Article III standing are without merit. Accordingly, we conclude that Ruffin has Article III standing to sue under ERISA § 502(a)(2) for breach of fiduciary duty.

D.

We now turn to the question of Ruffin's standing under ERISA. The district court held that, now that the Plan is terminated and the PBGC has been appointed statutory trustee, Ruffin no longer has standing under ERISA because "Title IV's insurance program is the exclusive means through which plan participants, such as [Ruffin], may recover benefits under the plan." (J.A. at 2182.)

Of course, "our analysis begins with the language of the statute." *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 438 (1999) (internal quotation marks omitted). The question of whether Ruffin as a Plan participant has standing under ERISA § 502(a)(2) after plan termination is really a question of whether *any* participant has such standing after plan termination.

ERISA § 502(a)(2) provides that "[a] civil action may be brought — by the Secretary [of Labor], or by a [plan] participant, beneficiary or fiduciary for appropriate relief under section 1109 of this title."[11] 29 U.S.C.A. § 1132(a)(2). NEL concedes that Ruffin is a Plan participant under ERISA (J.A. at 85),[12] and Ruffin's ERISA claim is for

---

[11]Section 1109 provides:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary. A fiduciary may also be removed for a violation of section 1111 of this title.

29 U.S.C.A. § 1109 (West 1999).

[12]ERISA defines "participant" as "any employee or former employee of an employer . . . who is or may become eligible to receive a benefit

breach of fiduciary duty, which is squarely within the scope of ERISA § 502(a)(2).

It is perhaps a massive understatement to say that the plain language of ERISA § 502(a)(2) favors Ruffin. The statute grants plan participants the right to sue for breach of fiduciary duty without qualification. It does not say that a plan participant can sue for breach of fiduciary duty "until plan termination" or "before plan termination," just that a participant can sue for breach of fiduciary duty. *See Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 108 (1989) ("ERISA provides 'a panoply of remedial devices' for participants and beneficiaries of benefit plans."); *Glanton ex rel. ALCOA Prescription Drug Plan v. AdvancePCS, Inc.*, 465 F.3d 1123, 1124 (9th Cir. 2006) ("ERISA authorizes plan participants to sue fiduciaries for losses the plan suffers from a breach of their duties."); *Madonia v. Blue Cross & Blue Shield of Va.*, 11 F.3d 444, 448 (4th Cir. 1993) ("ERISA confers standing upon 'participants' and 'beneficiaries' of an ERISA plan.").

Our review of ERISA reveals, and NEL concedes, that there is no provision in the statutory scheme that expressly revokes participants' standing upon termination of the plan. *See United States v. Morton*, 467 U.S. 822, 828 (1984) ("We do not . . . construe statutory phrases in isolation; we read statutes as a whole."). This makes sense in light of ERISA's purpose, which is to "protect . . . the interests of participants in employee benefit plans and their beneficiaries, . . . by establishing standards of conduct, responsibility, and obligation for fiduciaries . . . and by providing for appropriate remedies, sanctions, and ready access to the Federal courts." 29 U.S.C.A. § 1001(b) (West 1999).[13]

---

of any type from an employee benefit plan which covers employees of such employer . . . or whose beneficiaries may be eligible to receive any such benefit." 29 U.S.C.A. § 1002(7) (West 1999).

[13]Although, to our knowledge, no federal appellate court has directly addressed the question of whether participant standing ceases at plan termination, two district courts have squarely held that it does not, albeit in unpublished opinions. *See Naimoli v. Anchor Glass Container Corp.*, 2006 WL 1885682, at *14 (M.D. Fla. July 7, 2006)(unpublished) (hold-

Normally, where the statutory language provides a clear answer, our analysis begins and ends with that language. *Hughes Aircraft Co.*, 525 U.S. at 438. But NEL argues that the statute is deceiving and that Congress indeed has given participants standing with one hand and taken it away with the other. According to NEL, this revelation flows from ERISA § 502(a)(2)'s placement in Title I of the statute, which "concerns the establishment of employee benefit plans and the funding and governance of such plans while they are going concerns," and not in Title IV, which "concerns the termination of underfunded pension plans, establishes the PBGC, and provides for the payment of guaranteed benefits in the event of plan termination." (Appellee's Br. at 21-22.) Title IV provides the statutory trustee of a terminated plan with "the power . . . to collect for the plan any amounts due to the plan" and to "commence, prosecute, or defend on behalf of the plan any suit or proceeding involving the plan." 29 U.S.C.A. § 1342(d)(1)(B)(ii) and (iv). From this structure, NEL concludes that "Congress chose to grant broad and exclusive power and authority to the PBGC to prosecute claims on a plan's behalf *post-termination*." (Appellee's Br. at 26 (emphasis in original).)

NEL argues that Congress has vested this exclusive power in the PBGC in order to free the PBGC as statutory trustee from the potential *res judicata* or collateral estoppel effects of other litigation on the plan's behalf and to protect the Government's overriding interest in minimizing the drain on ERISA's insurance funds. According to NEL, a participant could settle his ERISA claim or otherwise obtain a less-than-favorable recovery for the plan, while potentially circumscribing the PBGC's authority to prosecute claims on behalf of the plan because of the preclusive effects of the litigation. In that case, the PBGC in its capacity as guarantor would be required to expend more of ERISA's insurance funds to pay guaranteed benefits to plan participants and beneficiaries, thereby resulting in a greater drain on

---

ing that Congress's "[g]ranting the PBGC 'the power' to bring suit does not eliminate a participant's existing right to bring suit, a right specifically granted to plan participants by 29 U.S.C. § 1132(a)(2)."); *Harpster v. Aarque Mgmt. Corp.*, 2005 WL 1719120, at *6 (N.D. Ohio July 22, 2005)(unpublished) (same).

the PBGC's already-limited resources and ultimately leading to higher premiums for employers.

Putting aside the plain language of ERISA § 502(a)(2) for a moment, which undoubtedly favors Ruffin and does not speak by mere implication, NEL's structural argument suffers from other intractable problems. Title IV does not expressly grant the statutory trustee the *exclusive* right to prosecute claims on behalf of the plan. *See* 29 U.S.C.A. § 1342(d)(1)(B)(iv). It only gives the statutory trustee "the power . . . to commence, prosecute, or defend on behalf of the plan any suit or proceeding involving the plan." Congress knows how to use the word 'exclusive' (or other similar words) when it intends to impose the kind of limitation that NEL believes precludes plan participants from suing after plan termination, and Congress in fact has done so in another of ERISA's provisions. *See* 29 U.S.C.A. § 1303(f)(4) (West 1999) ("This subsection shall be the *exclusive* means for bringing actions against the [PBGC] under this subchapter." (emphasis added)). "We do not lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply, and our reluctance is even greater when Congress has shown elsewhere in the same statute that it knows how to make such a requirement manifest." *Jama v. Immigration and Customs Enforcement*, 125 S. Ct. 694, 700 (2005). Insofar as the district court concluded — and NEL argues — that the statutory trustee, irrespective of who the trustee is, possesses exclusive authority to prosecute claims on behalf of a terminated plan, there is nothing in ERISA's text that supports such a conclusion.

To the extent that NEL argues that the *PBGC* must possess exclusive authority to bring breach-of-fiduciary claims on behalf of the terminated Plan when it is appointed as trustee because of the overriding interest in protecting ERISA's fisc, its argument conflates the PBGC's guarantor and trustee roles. Congress has not mandated that the PBGC serve as statutory trustee over every terminated plan. Indeed, ERISA provides that other persons or entities (which presumably could include a plan participant) may be appointed as statutory trustee for a terminated plan. *See* 29 U.S.C.A. § 1342(b). In such cases, the PBGC would not have control over the litigation decisions made by the trustee on behalf of the plan, even if the PBGC disagreed with the trustee's litigation strategy. Had Congress intended the

PBGC to make litigation decisions on behalf of all terminated plans as a means of protecting ERISA's fisc, it would have mandated that the PBGC be appointed as statutory trustee over all terminated plans. But Congress did not so choose, and this dooms NEL's argument that the PBGC must possess exclusive authority to prosecute claims on behalf of terminated plans in order to protect its insurance coffers.

NEL's *res judicata*/collateral estoppel argument fares no better. First, when the PBGC sues as trustee of a terminated plan, it seeks to vindicate the interests of the plan's participants, not its own interests as guarantor of ERISA's insurance program. In this regard, the PBGC is no different from a private trustee of an active or terminated plan, who may undoubtedly be bound by the results of private litigation if the trustee's interests were adequately represented in the previous litigation. Moreover, the PBGC in its capacity as statutory trustee can always intervene in ongoing private litigation, if necessary, to protect the plan or its participants. *See* Fed. R. Civ. P. 24. Indeed, the PBGC declined the opportunity to intervene in this case.

Second, assuming that the PBGC would be bound by the results of private ERISA litigation, the Government's hands would not be tied, for the Secretary of Labor, who sits on the PBGC's Board of Directors and has as at least as vested an interest in minimizing the drain on ERISA's insurance funds as the PBGC does, would be able to sue under ERISA § 502(a)(2) on behalf of the plan. Consistent with this understanding, a number of our sister circuits have held that, in light of the overarching national interest in ensuring the financial stability of pension plans and the inability of private plaintiffs to adequately represent this interest, the Secretary of Labor is not bound by the results reached by private litigants in ERISA suits. *See, e.g.*, *Herman v. S.C. Nat'l Bank*, 140 F.3d 1413, 1424 (11th Cir. 1998)(holding that Secretary of Labor is not bound under doctrine of *res judicata* by the results of private ERISA litigation because of the Secretary's overriding public interest that is separate and distinct from a private litigant's interests); *Sec. of Labor v. Fitzsimmons*, 805 F.2d 682, 687-91 (7th Cir. 1986)(en banc) (same); *Donovan v. Cunningham*, 716 F.2d 1455, 1462-63 (5th Cir. 1983) (same).

In sum, NEL's various arguments do not overcome the plain language of ERISA § 502(a)(2), which in no uncertain terms grants plan

participants standing to sue for fiduciary breaches. Nothing in the structure of ERISA evidences Congress's intent to cut off this standing after plan termination and appointment of the statutory trustee, be it the PBGC or a third party. We thus conclude that Ruffin has standing to sue under ERISA § 502(a)(2) for breach of fiduciary duties even though the Plan is terminated and the PBGC has been appointed statutory trustee.

III.

A.

Appellants also challenge the district court's grant of summary judgment to NEL on their state-law claims. The district court concluded ERISA preempted the claims because they relate to the Plan. We review questions of ERISA preemption de novo. *See Tri-State Mach., Inc. v. Nationwide Life Ins. Co.*, 33 F.3d 309, 311 (4th Cir. 1994).

Preemption is fundamentally a question of congressional intent. "The purpose of Congress is the ultimate touchstone." *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 45 (1987)(internal quotation marks omitted). Courts must "never assume[ ] lightly that Congress has derogated state regulation." *N. Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 654 (1995).

B.

ERISA's preemption clause states that "the provisions of [ERISA] shall supersede any and all State laws insofar as they now or hereafter relate to any employee benefit plan." 29 U.S.C.A. § 1144(a) (West 1999). The scope of ERISA's preemption is "deliberately expansive, and designed to establish pension plan regulation as exclusively a federal concern." *Pilot Life*, 481 U.S. at 46 (internal quotation marks omitted). "A law 'relates to' an employee benefit plan, in the normal sense of the phrase, if it has a connection with or reference to such a plan." *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96-97 (1983). The Supreme Court has repeatedly emphasized that ERISA's preemptive scope is not limited to "state laws specifically designed to affect

employee benefit plans." *Pilot Life*, 481 U.S. at 47-48 (internal quotation marks omitted); *see also Aetna Health Inc. v. Davila*, 542 U.S. 200, 209 (2004) ("[A]ny state-law cause of action that duplicates, supplements, or supplants the ERISA civil enforcement remedy . . . is pre-empted."); *Shaw*, 463 U.S. at 98 ("It would have been unnecessary to exempt generally applicable state criminal statutes from preemption in [§ 1144(b)], for example, if [§ 1144(a)] applied only to state laws dealing specifically with ERISA plans."). Nor may parties avoid ERISA's preemptive reach by recasting otherwise preempted claims as state-law contract and tort claims. *See Davila*, 542 U.S. at 214 ("[D]istinguishing between pre-empted and non-pre-empted claims based on the particular label affixed to them would elevate form over substance and [improperly] allow parties to evade the pre-emptive scope of ERISA."). Furthermore, ERISA's preemptive scope is not diminished simply because a finding of preemption will leave a gap in the relief available to a plaintiff. *See id.* at 214-15.

This is not to say that ERISA's preemptive scope is unbounded. "Some state actions may affect employee benefit plans in too tenuous, remote, or peripheral a manner to warrant a finding that the law 'relates to' the plan." *Shaw*, 463 U.S. at 100 n.21; *Mackey v. Lanier Collection Agency & Svc., Inc.*, 486 U.S. 825, 833 (1988)(noting that ERISA does not preempt "lawsuits *against* ERISA plans for run-of-the-mill state-law claims such as unpaid rent, failure to pay creditors, or event torts committed by an ERISA plan" even though such claims "obviously affect[ ] and involv[e] ERISA plans and their trustees"). The Supreme Court has recognized that "[i]f 'relate to' were taken to extend to the furthest stretch of its indeterminacy, then for all practical purposes pre-emption would never run its course, for really, universally, relations stop nowhere." *Travelers*, 514 U.S. at 655 (internal quotation marks omitted). Thus, as the Court put it, courts must go "beyond the unhelpful text . . . and look instead to the objectives of the ERISA statute as a guide to the scope of the state law that Congress understood would survive." *Id.* at 656.

Considering ERISA's objectives set forth in 29 U.S.C.A. § 1001(b), the Supreme Court has explained that Congress intended ERISA to preempt *at least* three categories of state law: (1) laws that "mandate[ ] employee benefit structures or their administration"; (2) laws that bind employers or plan administrators to particular choices

or preclude uniform administrative practice; and (3) "laws providing alternate enforcement mechanisms" for employees to obtain ERISA plan benefits. *Id.* at 658-59; *Coyne & Delaney Co. v. Selman*, 98 F.3d 1457, 1469 (4th Cir. 1996). A key feature of these categories of laws is that they "implicate the relations among the traditional ERISA plan entities." *Selman*, 98 F.3d at 1469 (internal quotation marks omitted).

C.

Appellants' state-law claims against NEL consist of claims under North Carolina law for unfair and deceptive trade practices, breach of contract, negligent misrepresentation, and constructive fraud. Each of these claims incorporates the allegations from Ruffin's ERISA claim. Appellants also set forth independent factual allegations to support each of the claims, but these allegations largely, if not completely, restate the general allegations underlying Ruffin's ERISA claim. The state-law claims, like the ERISA claim, are, as the district court noted, "based on the investment of the Plan and the Developmental Properties Account ("DPA"), the illiquidity of the DPA, and termination of the Plan." (J.A. at 2183.) Indeed, Appellants acknowledge that their state-law claims "arise from the same factual circumstances as [Ruffin's] ERISA claim." (Appellant's Br. at 46.)

It is thus not surprising that Appellants admit that the district court ultimately "may have been right" in concluding that ERISA preempts their state-law claims. (Appellants' Br. at 45.) They contend, however, that the district court acted prematurely in granting summary judgment to NEL on the basis of ERISA preemption "without determining predicate issues of fact concerning NEL's fiduciary status." (Appellants' Br. at 45.) Appellants argue that their state-law claims may not be preempted if it is later determined that NEL is not a fiduciary under ERISA, this despite conceding that their state-law claims arise from the same set of facts supporting Ruffin's ERISA claim.

Appellants' wait-and-see argument is unavailing. We have held that ERISA preempts state-law claims against nonfiduciaries if those claims relate to a plan. *Custer v. Pan Am. Life Ins. Co.*, 12 F.3d 410, 419 (4th Cir. 1993). The central question is not whether a particular defendant is a fiduciary, or whether the preemption decision would create a gap in the law with respect to suits against nonfiduciaries,

"but rather [ ] whether the action *relates* to any employee benefit plan." *Id.* (emphasis in original); *see also Consol. Beef Indus., Inc. v. N.Y. Life. Ins. Co.*, 949 F.2d 960, 964 (8th Cir. 1991)("Whether [an entity] is a fiduciary under ERISA or not does not affect our ERISA preemption analysis."); *Gibson v. Prudential Ins. of Am.*, 915 F.2d 414, 418 (9th Cir. 1990) ("Congress intend[ed] ERISA to preempt claims that relate to an employee benefit plan even if the defendant is a nonfiduciary."); *Howard v. Parisian, Inc.*, 807 F.2d 1560, 1565 (11th Cir. 1987) (holding that Congress's failure to provide for comprehensive relief against nonfiduciaries does not alter the principle that state-law actions against nonfiduciaries are preempted if they relate to an ERISA-covered plan).

This focus on the conduct underlying a claim also makes good sense given that fiduciary status under ERISA is not "an all-or-nothing concept." *Coleman v. Nationwide Life Ins. Co.*, 969 F.2d 54, 61 (4th Cir. 1992). Under ERISA, a person is a fiduciary

> *to the extent that* (I) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

29 U.S.C.A. § 1002(21)(A) (West 1999) (emphasis added).The definition is couched in terms of functional control and authority over the plan, thus necessitating that courts "examine the conduct at issue when determining whether an individual is an ERISA fiduciary." *Hamilton v. Carell*, 243 F.3d 992, 998 (6th Cir. 2001). A person may be an ERISA fiduciary for some purposes and not for others. NEL's stance in this case is illustrative: although it denies fiduciary status with respect to Appellants' claims, it concedes that it is a fiduciary for some purposes under ERISA.

Here, by conceding that their state-law claims would otherwise be preempted if NEL had admitted its fiduciary status under ERISA,

Appellants effectively admit that *substantively* their state-law claims relate to the Plan. They could hardly do otherwise. The focus of Appellants's state-law claims is on NEL's management and investment of Plan assets, conduct that, irrespective of NEL's denial of fiduciary status, clearly lies near the heartland of ERISA's coverage. Indeed, Appellants candidly characterize their state-law claims as "alternatives" to Ruffin's ERISA claim, a good tip off that they seek the kind of "alternate enforcement mechanism[ ]" that ERISA preempts. *See Travelers*, 514 U.S. at 658.

In a final effort to salvage their state-law claims, Appellants contend that our decisions in *LeBlanc v. Cahill*, 153 F.3d 134 (4th Cir. 1998),and *Custer v. Sweeney*, 89 F.3d 1156 (4th Cir. 1996), leave open the possibility that their claims might not be preempted, but no such comfort can be found in those cases. Both of those cases involved state-law claims against third parties who did not have exclusive, or even primary, responsibility for or discretion over investment of the plan's assets. Here, in contrast, Appellants' state-law claims rest on the very same allegations that support Ruffin's ERISA claim and focus on NEL's alleged mismanagement and imprudent investment of Plan funds. *Leblanc* and *Custer* thus are factually inapposite.

In sum, the district court did not err in ruling that ERISA preempts Appellants' state-law claims without first establishing NEL's fiduciary status with respect to each function it served in its relationship with the Plan. Because Appellants' state-law claims merely repackage Ruffin's ERISA claim, they are preempted by ERISA.

IV.

For the foregoing reasons, we reverse the district court's grant of summary judgment to NEL on Ruffin's ERISA claim and affirm the district court's grant of summary judgment to NEL on Appellants' state-law claims for unfair and deceptive trade practices, breach of contract, negligent misrepresentation, and constructive fraud. We remand to the district court for further proceedings consistent with this opinion.

*AFFIRMED IN PART AND REVERSED IN PART*